IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

United States of America

      v.                                      Case No. 1:25-CR-269-TSC

Ricardo Blackson

### Defendant's Post-Hearing Additional Motion to Suppress

On August 28, six police vehicles stopped Blackson's vehicle as he was driving in southwest DC. Rather than initiate their lights and wait for Blackson to pull over, the police vehicles completely surrounded his car with their emergency lights and sirens activated. Blackson's car was stopped part-way into a cross walk just as he was about to go through an intersection. A police truck stopped in front of his car. One appears to have blocked-in the vehicle on each side, and two police vehicles were stopped at the rear of the car. Blackson immediately complied, stopped his vehicle, and rolled down all his windows.

Officer Brennan began speaking to Blackson while standing outside the driver's door. As he was positioned there, other officers surrounded Blackson's vehicle on the other side, with one leaning into the vehicle through the open passenger. Brennan began the traffic stop by asking Blackson about his front plate, though he quickly transitioned to topics unrelated to the traffic stop. He used his flashlight to peer inside Blackson's vehicle and asked him if he had any weapons in the car. He also asked Blackson where he was driving to, where he was coming from, and then began to question Blackson about a backpack that was in the backseat of the car. Brennan asked Blackson if he had ever been arrested before, when, and for what before asking if he could look inside the backpack. Blackson politely declined the officer's request to search and asked if he had a reason why he would want to search the vehicle. Brennan replied that he only asked to search the backpack, not the vehicle. Blackson

then responded that he did not want to open anything else. Brennan then ordered Blackson to step out the vehicle. Blackson asked if he could take his phone with him, and he exited the vehicle with his hands conspicuously displayed the entire time.

As Blackson stood at the back of the vehicle with his hands resting on the trunk, four officers were standing at the passenger side of his vehicle peering inside it.



Blackson, at the time, was flanked by two other officers in addition to Brennan. Every officer was wearing ballistic vests and had visible firearms on their hips. Brennan then questioned Blackson again about the backpack, asking "there's nothing in the backpack?" Blackson again questioned why police would want to search anything inside his vehicle, and he and Brennan quibbled with whether Blackson's answers were responsive to Brennan's questions. Blackson was clear, though: he was not providing consent to search anything inside his vehicle. At some point during the encounter, the police vehicle to the left of Blackson's car moved. However, as Blackson was standing at the rear of his car, two officers remained by his side

the entire time, and several officers milled about either by the side of his car or walked back and forth.

Around 14:26, Brennan asked another officer to call CSOSA to see if Blackson was eligible to be searched through a probation or parole exception to the warrant requirement. Brennan then went back to Blackson and asked him about his children. He asked how old they were, whether they stay with Blackson, the last time he saw them. Brennan then tried to confront Blackson with what he thought was an inconsistency: "so you have kids, but you called it a children's bookbag. So which one of . . ." He then continued to interrogate Blackson about who the backpack belonged to.

**Blackson was in custody when he was removed from his vehicle and told to stand at the rear of his car surrounded by officers.**

"As used in our *Miranda* case law, *custody* is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508 – 09 (2012). Formal arrests constitute *Miranda* custody. *Thompson v. Keohan*, 516 U.S. 99, 112 (1995). But even if a defendant has not been formally arrested, he may be in custody if his freedom of movement is restrained "to the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiuam). The ultimate question is whether, under all the circumstances surrounding the interrogation, "a reasonable person [would not have felt] he or she was . . . at liberty to terminate the interrogation and leave." *See Thompson*, 516 U.S. at 112.

Ordinarily, routine traffic stops do not place suspects in custody for *Miranda* purposes. *See Berkemer v. McCarty*, 468 U.S. 420, 438 – 441 (1984); *United States v. Vinton*, 594 F.3d 14, 26 – 27 (D.C. Cir. 2010). In making this decision, the Supreme Court noted that traffic stops are relatively brief and limited in scope, and that they occur in public and that

"the detained motorist typically is confronted by only one or at most two policemen." *See Berkemer*, 468 U.S. at 438. But the court was also clear that traffic stops *can become* custodial. *See id.* at 440 ([i]f a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*"). By *Berkemer*'s own language, the presence of multiple officers is a factor for the court to consider. *See id. see also New York v. Quarles*, 467 U.S. 649, 655 (1984) (considering the number of officers when finding defendant was in custody during interrogation, though defendant was also handcuffed). The nature of questioning can also be a factor for the court to consider, especially when police confront a defendant with supposed contradictory information. *See United States v. Lee*, 699 F.2d 466, 468 (9th Cir. 1982) (considering as a custody factor that police officers confronted the defendant for fifteen minutes and told him it was time to tell the truth).

The circumstances of Blackson's detention are a far cry from an ordinary traffic stop. First, Blackson was not stopped in typical fashion: his vehicle was boxed in from every direction by numerous unmarked police vehicles. Second, from the outset, multiple armed officers wearing tactical vests surrounded his vehicle. Third, he was repeatedly questioned about a backpack—something completely unrelated to the purpose of the traffic stop—and was confronted multiple times and told that he was not being responsive to the officers' questions. Fourth, Blackson was ordered out of the vehicle and told to stand near the trunk while two armed officers remained within feet of him, and where he was able to see at least four officers peering into his vehicle. From the outset, this was a police dominated environment, and no reasonable person under the circumstances would feel free to terminate the police interrogation.

**Blackson gave responses to direct questioning, meaning he was interrogated by the police.**

Blackson's statements were direct responses to express questioning by the police. Interrogation is defined as "express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300 – 301 (1980). Thus, any responses to direct questions about who the backpack belonged to should be considered responses to interrogation.

**Blackson's statements and the fruits of his unwarned statements should be suppressed.**

If the Court finds that Blackson was in custody when he responded to direct questioning about the backpack in his vehicle, then the court should suppress the statements. Blackson also argues that the court should suppress the fruits of those statements as well, including the resulting dog sniff. *See United States v. Brown*, 125 F.4th 1186, 1204 (D.C. Cir. 2025) (suppressing the fruits of a Fifth Amendment violation); *United States v. Lee*, 699 F.2d 466, 468 (9th Cir. 1982) (suppressing physical evidence found after an unwarned interrogation). But for Blackson's story about the backpack changing, officers would not have requested a dog sniff. At 14:40 on his body-worn camera, Officer Brennan specifically mentioned 3 circumstances that led to his request for the dog sniff: his prior murder conviction, the fact of the backpack, and that his story wasn't making sense and had changed. Absent the changing story, the evidence in the record does not support that the police would have obtained a dog sniff. As such, unless the government presents sufficient evidence that police would have obtained the dog sniff anyway, the fruits of Blackson's custodial interrogation should be suppressed.

        Respectfully submitted,

        A. J. KRAMER
        FEDERAL PUBLIC DEFENDER

*/s/ Benjamin Schiffelbein*
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
